UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                          :
GLOBAL GOLD MINING, LLC,                                  :
                                                          :
                              Plaintiff,                  :
                                                          :          12 Civ. 1847 (JPO)
            -v-                                           :
                                                          :          OPINION AND ORDER
VARDAN AYVAZIAN,                                          :
                                                          :
                              Defendant.                  :
                                                          :
-------------------------------------------------------------X


J. PAUL OETKEN, District Judge:

        This case arises out of the 2003 purchase of an Armenian gold mine by Global Gold

Mining, LLC ("Global Gold" or "Plaintiff").  Global Gold brought this action against Vardan

Ayvazian ("Ayvazian" or "Defendant") for money damages arising from alleged contract

violations and, in the alternative, to vacate an international arbitration tribunal's partial arbitral

award in the underlying dispute.  This action follows a series of prior disputes between Global

Gold and Ayvazian, including two actions brought by Global Gold in the Southern District of

New York to establish the jurisdiction of the arbitration tribunal—the very body whose

unfavorable determination Plaintiff now seeks to vacate.  Ayvazian defaulted in this case, and a

default judgment was entered against him in the amount of $37,537,978.02.  He now moves to

vacate that default judgment.  For the reasons that follow, that motion is granted and, because

this Court lacks personal jurisdiction over the defendant, the case is dismissed.

1

I.      **Background**[1]

   A.      **The Underlying Dispute**

In 2003, Global Gold entered into a Share Purchase Agreement ("the Agreement") to purchase all of the shares of an Armenian gold mining company, SHA, LLC, from its three listed shareholders: Mayren Batoyan, Edward Janibekian, and Yurik Lalazaryan (collectively, "SHA shareholders").  Global Gold later discovered what it believed to be material misrepresentations in the Agreement.  Pursuant to an arbitration clause in the Agreement, in December 2006, Global Gold filed a request with the International Chamber of Commerce Court of Arbitration ("ICA") to resolve this issue through arbitration.  Global Gold named Ayvazian, in addition to the three named shareholders, as a defendant in that dispute.

Ayvazian is not named as a shareholder or otherwise mentioned in the Agreement. Global Gold alleged, however, that Ayvazian was an undisclosed shareholder and a beneficial owner of SHA, and that he secretly controlled and benefitted from the sale of SHA to Global Gold.[2]  In a series of matters in arbitral tribunals and judicial courts, Global Gold sought to hold Ayvazian personally responsible for losses it claims to have incurred from breaches of the Agreement.

---

[1] The following facts, unless otherwise indicated, are taken from the Memorandum of Law in Support of Defendant's Motion to Vacate Default Judgment and the exhibits thereto (Dkt. No. 17), as well as the parties' other filings and accompanying exhibits.  *See generally* Section II.A, *infra* (citing *Davis v. Musler*, 713 F.2d 907, 915 (2d Cir. 1983) ("[A]ll doubts should be resolved in favor of those seeking relief . . . .")).

[2] At the time of the sale, Ayvazian was Armenia's Minister of the Environment, and thus had regulatory influence over the mining industry, including over SHA.  Global Gold alleges that Ayvazian wielded his influence to its detriment, particularly with respect to its purchase of SHA.

The bulk of the litigation to date has concerned whether Ayvazian is bound by the Agreement and its arbitration clause.  The Agreement contains the following language as part of its arbitration clause:

> The parties will use their best efforts to resolve any disputes between themselves . . . . [I]f a dispute is not resolved, any party may refer the dispute for final settlement to and in accord with under [sic] the Rules of Conciliation and Arbitration of the International Chamber of Commerce ["ICC"]. . . by a panel of three (3) arbitrators. In the case of any matter to be settled under the Rules, each party hereto shall appoint one arbitrator and such two arbitrators shall appoint a third arbitrator . . .  The place of arbitration of any matter to be settled under the Rules shall be in New York City . . . .

(Dkt. No. 17, Ex. G ("ICA Tribunal Decision") at 2).  The parties also agreed to apply "the substantive laws of New York, without regard to conflict of laws provisions."  (*Id.*)

### B.     Prior Related Litigation

Prior to the instant case, Global Gold twice pursued arbitration and twice brought cases in this Court relating to this dispute.  In the prior matters, Global Gold sought to establish that, under the terms of the Agreement, the ICA Tribunal enjoys the power to decide both the merits of the dispute and whether Ayvazian is subject to the Agreement's arbitration clause.  In the instant action, Global Gold returns to federal court to vacate the ICA Tribunal's unfavorable arbitrability determination as to Ayvazian.  Ayvazian has consistently defaulted in these actions.

First, Global Gold initiated an arbitration against Ayvazian and the SHA shareholders in December 2006.  "None of the named parties responded to the demand for arbitration."  Feb. 5, 2008 Order at 2, *Global Gold Mining, LLC v. Peter M. Robinson, et al.*, No. 07 Civ. 10492 (GEL), *available at* Dkt. No. 17, Ex. E ("2008 Order").  As a result of the default, under the rules adopted by the Agreement, the ICA made a preliminary determination on arbitrability: the ICA

3

found that an arbitration agreement existed between Global Gold and the three named SHA shareholders but did not bind Ayvazian. Therefore, the ICA Tribunal lacked authority to hear claims against Ayvazian.[3]  Global Gold's request for reconsideration was denied.

Second, Global Gold sued the ICA and its officers in New York State Court, seeking an order directing the ICA to refer the underlying dispute against Ayvazian to the ICA Tribunal, which had been convened to arbitrate the dispute between Global Gold and the three SHA shareholders. The suit was removed to this Court, where the Honorable Gerard G. Lynch dismissed the case, holding that an action directed against the ICA violated principles of arbitral immunity ("2008 Order"). Ayvazian was not a named defendant and did not appear in that case.

Third, Global Gold sued Ayvazian in this Court, seeking an order directing Ayvazian to personally submit to the authority of the ICA Tribunal. Ayvazian defaulted again, and in June 2008, the Honorable Deborah A. Batts entered a default judgment ordering, among other things, that "Vardan Ayvazian shall be a respondent in [the] ICC Case . . . and that the tribunal . . . shall finally resolve the claims brought by Global Gold . . . ." June 25, 2008 Default Judgment, *Global Gold Mining, LLC v. Vardan Ayvazian*, No. 08 Civ. 1713 (DAB), *available at* Dkt. No. 17, Ex. F ("2008 Default Judgment"). Under the 2008 Default Judgment, Global Gold won the right to compel Ayvazian to submit to the ICA Tribunal on the issue of arbitrability. Rather than relying on the ICA's initial determination that the Agreement's arbitration clause did not bind

---

[3] The ICA, a unit of the International Chamber of Commerce ("ICC"), oversees and administers arbitrations in accordance with the ICC's Rules of Conciliation and Arbitration. It is distinct from the three-member ICA Tribunal that was specially convened, per the terms of the Agreement, to resolve the underlying dispute in this case. The ICA makes initial administrative and procedural determinations before issues are heard before an ICA tribunal.

Ayvazian, Global Gold could now relitigate that issue before a specially convened ICA Tribunal.[4]  Ayvazian did not move to vacate that judgment.

Fourth, in the subsequent arbitration, the ICA Tribunal reconsidered the issue of arbitrability as to Ayvazian.  Although Ayvazian failed to appear before the Tribunal, that body identified "no basis for finding Mr. Ayvazian in some way a party to the [Agreement] and its arbitration clause."  (ICA Tribunal Decision at 11.)  Consequently, the ICA Tribunal found that it lacked jurisdiction over Ayvazian, who was again released from arbitration.  (*Id.* at 12.)

**C.     The Current Lawsuit and Motion to Vacate Default Judgment**

That brings us to the instant case: the fifth dispute brought before a court or arbitral tribunal, and the third lawsuit in the Southern District of New York by Global Gold seeking to hold Ayvazian accountable for breaching the Agreement.  Unsatisfied with the arbitrability decision of the Tribunal whose power it had litigated so aggressively to assert, Global Gold next sought to vacate that unfavorable outcome, and, in the alternative, to recover damages from Ayvazian.

Ayvazian defaulted again in this case, and a $37,537,978.02 default judgment was entered against him on July 10, 2012.  However, on June 25, 2013, for the first time in this series of disputes, Ayvazian appeared in a motion to vacate the 2012 default judgment.[5]  Ayvazian

---

[4] In accordance with the terms of the Agreement, and pursuant to ICA Rules, that three-member tribunal comprised one member, Mr. Jonathan D. Schiller, nominated by Global Gold, one member, Professor Ivan Zykin, nominated by the ICC Court on behalf of the absent respondents, and one member, Professor Hans Smit, nominated by the ICA upon failure of the co-arbitrators to make a timely joint nomination.  Professor Smit was subsequently replaced by Dr. Horacio A. Grigera Naón as the Chair of the ICA Tribunal.

[5] This motion, filed less than a year after entry of the default judgment that it seeks to vacate, is timely even under the strictest interpretation of the rules.  *See* Fed. R. Civ. P. 60(c)(1) ("A

asserts, among other arguments, that the default judgment was void under Rule 60(b)(4) because this Court lacks personal jurisdiction over him.

## II.    Discussion

### A.    Standard for Vacating Default Judgment

Default judgment is an extreme sanction that is disfavored in the Second Circuit. *See Pecarsky v. Galaxiworld.com Ltd.*, 249 F.3d 167, 174 (2d Cir. 2001) ("It is well established that default judgments are disfavored."); *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983). Federal Rules of Civil Procedure 55(c) and 60(b) together provide the framework for vacating default judgments. A court may vacate default judgment "for good cause" under Rule 55(c), or for any of the six enumerated bases listed under Rule 60(b): (1) "mistake, inadvertence, surprise, or excusable neglect"; (2) "newly discovered evidence"; (3) fraud; (4) the judgment is void; (5) the judgment is moot or no longer equitable; and (6) "any other reason that justifies relief." Of these grounds for vacating default judgment, Rule 60(b)(4) is "unique" because "relief is not discretionary and a meritorious defense is not necessary." *Covington Indus. v. Resintex A. G.*, 629 F.2d 730, 733 n.3 (2d Cir. 1980). The Second Circuit has held that denial of a motion to vacate default judgment is an abuse of discretion where there are substantial issues regarding the judgment's validity. *See Cent. Vermont Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 189 (2d Cir. 2003) ("[I]f the underlying judgment is void, it is a *per se* abuse of discretion for a district court to deny a movant's motion to vacate the judgment under Rule 60(b)(4)." (internal quotation omitted)); *Davis v. Musler*, 713 F.2d 907.

---

motion under Rule 60(b)[(1)-(3)] must be made within . . . a year after the entry of the judgment . . . ."); *cf. Beller & Keller v. Tyler*, 120 F.3d 21, 24 (2d Cir. 1997) ("[A] motion to vacate a default judgment as void [under Rule 60(b)(4)] may be made at any time.") (internal quotations omitted).

Furthermore, "motions to vacate default judgments are to be granted liberally." *Int'l Cargo & Sur. Ins. v. Mora Textiles Corp.*, 1991 WL 120359, at *2 (S.D.N.Y. 1991); *see also Standard Enterprises, Inc. v. Bag-It, Inc.*, 115 F.R.D. 38, 39 (S.D.N.Y. 1987) ("Rule 60(b) is its strongest in the context of setting aside default judgments . . . . 'There is much more reason for . . . reopening a judgment when the merits of the case never have been considered than there is when the judgment comes after a full trial on the merits.'" (quoting C. Wright & A. Miller, 11 Fed. Prac. and Proc. § 2857, at 160 (1973))).  "[A]ll doubts should be resolved in favor of those seeking relief." *Davis v. Musler*, 713 F.2d at 915.  As a general limiting principle, "[t]he extreme sanction of a default judgment must remain a weapon of last, rather than first, resort which should only be imposed upon a serious showing of willful default." *Id.* at 916 (internal quotations and citations omitted).

**B.      The Default Judgment Is Void for Lack of Personal Jurisdiction**

Ayvazian argues that the default judgment is void under Rule 60(b)(4) because this Court lacks personal jurisdiction over him.  The jurisdiction of this Court is defined by Rule 4(k)(1)(A), bound by the jurisdiction of New York State Courts, and restrained by constitutional due process considerations.

The jurisdictional due process analysis looks to two factors: first, whether Ayvazian "has certain minimum contacts with the forum," and second, whether, under a reasonableness inquiry, "the maintenance of the suit [would] . . . offend traditional notions of fair play and substantial justice." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (internal quotations omitted); *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945). "To establish the minimum contacts necessary to justify specific jurisdiction, the plaintiff first must show that his claim arises out of or relates to defendant's contacts with the forum state.

7

The plaintiff must also show that the defendant purposefully availed himself of the privilege of doing business in the forum state and that the defendant could foresee being haled into court there." *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 242-43 (2d Cir. 1999) (internal quotations and citations omitted).  In other words, "[t]he crucial question is whether the defendant has purposefully availed [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws, such that the defendant should reasonably anticipate being haled into court there." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242-43 (2d Cir. 2007) (internal quotations and citations omitted).

Ayvazian is being sued in his personal capacity.  He is a citizen of Armenia, where he resides.  He has visited the United States on six occasions.  From 2003 to 2006, he made four trips to New York City to attend the annual United Nations Conference on Sustainable Development in his official capacity as Armenia's Minister of the Environment.  In 2006, he accompanied his son to a medical consultation in Los Angeles; he did not visit New York during that trip.  Finally, Ayvazian spent two days in New York City during a personal trip in 2008. Ayvazian's contacts with the forum state were isolated, infrequent, and unrelated to the Agreement or the underlying dispute.

Resolving doubt in favor of the party seeking relief from the default judgment, the Court finds that Ayvazian's isolated personal and diplomatic visits to the forum fall well beneath the "minimum contacts" threshold.[6]  Neither party has suggested that his isolated visits to the forum state gave rise to the underlying dispute, or that Ayvazian purposefully availed himself of

---

[6] The alternative option of finding general jurisdiction also fails as it requires an even higher showing of "continuous and systematic" contacts.  *See Perkins v. Benguet Consol. Min. Co.*, 342 U.S. 437 (1952).

commercial opportunities within the forum state.[7]  Furthermore, it was not reasonable to expect Ayvazian, an Armenian citizen with almost no exposure to the United States, to defend himself in a dispute over a decade-old contract to which two arbitral bodies have ruled he was never a party.

Global Gold argues that personal jurisdiction over Ayvazian exists under the Agreement and the 2008 Default Judgment.  Both arguments fail.  First, the Agreement does not confer personal jurisdiction over Ayvazian in this case.  Rather, the Agreement commits "any disputes" to arbitration.[8]  Courts will not intervene where an arbitration agreement refers all disputes, including issues of arbitrability, to arbitral courts.  In *Shaw Group Inc. v. Triplefine International Corp.*, the Second Circuit vacated a district court's order and found that "[b]ecause the arbitration agreement at issue . . . provides for all disputes between the parties to be referred to the International Chamber of Commerce ("ICC") . . . the arbitrability of [the] contract claim . . . was a question for the arbitrator rather than the court."  322 F.3d 115, 118 (2d Cir. 2003).  The ICA and the ICA Tribunal have both ruled that Ayvazian is not bound by the Agreement. Ayvazian has been conclusively held not to be a party to the Agreement under its own procedural terms; since the Agreement does not apply to him, it cannot constitute a waiver of personal jurisdiction.

---

[7] Global Gold's conclusory assertion in the complaint that Ayvazian "has substantial contacts" with the forum will not be credited.  Cmpl., Dkt. No. 1, at 6; *cf Ashcroft v. Iqbal*, 556 U.S. 662, 665 (2009) ("[The Rules] do[] not require courts to credit a complaint's conclusory statements without reference to its factual context.").

[8] In an earlier proceeding, Global Gold alleged that the Agreement "contains an arbitration clause . . . providing that all disputes under the agreement will be referred for final settlement to a panel of three arbitrators," namely, the ICA Tribunal.  Petition to Compel Arbitration at 2, *Global Gold Mining, LLC v. Vardan Ayvazian*, (No. 08 Civ. 1713 (DAB)).

Second, the 2008 Default Judgment does not establish personal jurisdiction over Ayvazian. If courts were able to extend their personal jurisdiction simply by ordering it so, the complex law of personal jurisdiction would be rendered moot and the constitutional due process protections afforded therein would be a nullity. The practice of collateral challenges to default judgments, long established in the federal courts, demonstrates that a court's order of default judgment does not automatically subject a litigant to that court's jurisdiction.[9] *See Ins. Corp. of Ireland  v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706, (1982) ("A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding."); *see also Pennoyer v. Neff*, 95 U.S. 714 (1877) (exemplifying the foundational principle that collateral attacks are permitted against default judgments that are void for a lack of personal jurisdiction). Also, the 2008 Default Judgment states that the arbitral Tribunal "shall finally resolve" Global Gold's claims against Ayvazian. Consequently, even if the 2008 court had personal jurisdiction— a topic which that court did not address— it exercised that power to transfer final decision-making power to the Tribunal, which then released Ayvazian from the Agreement. No reading of the 2008 Default Judgment warrants finding personal jurisdiction: either the 2008 judgment is void

---

[9] Contrary to Plaintiff's assertions (Dkt. No. 24 ("Opposition Memo") at 3), collateral challenges based upon defects in personal jurisdiction are not waived when the defendant fails to specifically address *res judicata* arguments. *See Grammenos v. Lemos*, 457 F.2d 1067, 1070 (2d Cir. 1972) (suggesting that personal jurisdiction should only be waived where "a party enters a case, *makes no objection to jurisdiction*, and asks the court to act on its behalf in some substantive way") (emphasis added); *see also Orange Theatre Corp. v. Rayherstz Amusement Corp.*, 139 F.2d 871, 874 (3d Cir. 1944) (observing the elimination of special appearance rules under the Federal Rules, and suggesting that a defendant need not "intone [some] ancient abracadabra of the law . . .  in order by its magic power to enable himself to" enter a court to contest its jurisdiction).

for lack of jurisdiction, or, if valid, it forbids Global Gold from coming before this Court to contest the final resolution of the arbitral Tribunal.

Finally, Plaintiff's complaint fails to identify any basis that would plausibly warrant vacatur of the arbitration award under the exceedingly limited grounds for such vacatur, such as "corruption," "fraud," "misconduct," or the arbitrators' "exceed[ing] their powers." 9 U.S.C. § 10(a). Global Gold brought this action notwithstanding the high standard for vacating the final decision of an arbitral award. *See* Federal Arbitration Act, 9 U.S.C. § 10(a); *Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 120 (2d Cir. 1991) ("It is well-settled that judicial review of an arbitration award is narrowly limited."); *Miss Universe L.P., LLLP. v. Monnin*, 12 Civ. 9174 (JPO), 2013 WL 3328241 (S.D.N.Y. July 2, 2013) (discussing the limited circumstances for vacating an arbitral decision). Although the merits of this case have largely been rendered moot, first by the default judgment, and now by jurisdictional flaws, to the extent that the merits overlap with a suggestion of jurisdiction by waiver, it is clear that Global Gold fails to state a legally sufficient basis for vacating the arbitral decision, just as it fails to state a legally sufficient basis for finding personal jurisdiction.

### C.      Additional Arguments for Vacating Default Judgment

Because the lack of personal jurisdiction mandates vacatur of the default judgment under Rule 60(b)(4), Ayvazian's remaining arguments are rendered moot. Put simply, those arguments are as follows: first, he argues that the judgment is void under Rule 60(b)(4) because of defective service; second, he argues for vacatur under Rule 60(b)(3) because of misrepresentations by Global Gold; third, he argues that Plaintiff failed to follow local rules; and fourth, he argues that equity and the Second Circuit's three-factor test for discretionary vacatur of default judgments warrant relief from the default judgment. The first three arguments are legally and factually

weak.  An application of the Second Circuit's test, however, provides further support for vacating this default judgment as a matter of equity.

The Second Circuit has established a three-factor test that guides district courts' broad discretion in deciding motions to vacate default judgments outside the context of Rule 60(b)(4). Courts are to consider "(1) whether the default was willful; (2) whether setting aside the default would prejudice the party for whom default was awarded; and (3) whether the moving party has presented a meritorious defense." *Peterson v. Syracuse Police Dep't*, 467 F. App'x 31, 33 (2d Cir. 2012).

First, under the willfulness factor, a showing that a default was inadvertent is sufficient but not necessary to vacate a default judgment. *Compare Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983) (finding that default judgment "should *only* be imposed upon a serious showing of willful default") (internal quotations omitted) (emphasis added), *with Wagstaff–El v. Carlton Press Company*, 913 F.2d 56, 57 (2d Cir.1990), *cert. denied*, 111 S.Ct. 2332 (1991) (upholding district court's decision to vacate default judgment even though movant's default was willful), *and Kumar v. Ford,* 111 F.R.D. 34, 39-40 (S.D.N.Y.1986) (vacating default judgment even though default was willful).  The Second Circuit has "interpreted 'willfulness' in the context of a default, to refer to conduct that is . . . egregious and was not satisfactorily explained" and not "merely negligent or careless."  *S.E.C. v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998).

Ayvazian's failure to appear in any of the disputes detailed above may suggest willful default.  In this case, however, he asserts a good faith belief that the arbitral Tribunal's decision released him from further litigation.  Courts are particularly reluctant to find willfulness where a defaulting defendant was facing multiple suits regarding the same underlying dispute.  *See, e.g.*, *Davis v. Musler*, 713 F.2d at 915 (remanding a decision not to vacate default judgment where

12

defendants claimed that they mistook a second complaint for supplemental papers in the initial suit); *McVicker v. Donnelly*, 95 F.R.D. 353, 355 (E.D. Pa. 1982) (finding "excusable neglect" based on "confusion resulting from the time proximity and subject matter similarity of . . . two proceedings"). Given these courts' solicitude toward defendants facing just two suits, and resolving doubt in favor of the defendant, whose case has now been implicated in numerous disputes, this default was not conclusively willful. In any case, the next two factors provide further equitable justification for vacatur.

The second factor, prejudice to the non-defaulting party, has been described as "the single most persuasive reason" for denying motions to vacate default judgment. C. Wright, A. Miller and M. Kane § 2699 (3d ed. 2010). The "requisite level of prejudice," however, requires a showing of prejudice that "cannot be rectified in the Court in another manner were the default to be vacated." *Murray Eng'g, P.C. v. Windermere Properties LLC*, 12 Civ. 52 (JPO), 2013 WL 1809637 at *5 (S.D.N.Y. Apr. 30, 2013). To demonstrate prejudice, the parties must establish "that delay will 'result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion.'" *Davis v. Musler*, 713 F.2d at 916 (quoting C. Wright, A. Miller and M. Kane, § 2699). Global Gold misapplies this standard and makes no assertions that establish prejudice of this nature.

Finally, the Court considers whether Ayvazian presented a "meritorious defense." "The test of such a defense is [not whether] . . . it will carry the day, but whether the evidence submitted, if proven at trial, would constitute a complete defense." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 98 (2d Cir. 1993). In addition to the persuasive arguments demonstrating a lack of personal jurisdiction, Ayvazian has raised defenses based on defective service, *res judicata*, and respect for the arbitral Tribunal. These defenses, taken together with

the inconclusive evidence of willful default by Ayvazian, and the lack of prejudice suffered by Global Gold, suggest that vacating the default judgment in this case is equitable and appropriate.

### D.    Lack of Personal Jurisdiction Warrants Dismissal of This Case

Finally, the lack of personal jurisdiction over Ayvazian, established above, calls for dismissal of this case.  Although the parties have not specifically requested dismissal under Rule 12(b)(2), the issue of personal jurisdiction was squarely presented and fully briefed on Defendant's Motion to Vacate Default Judgment.  Therefore, "this Court has the authority to vacate its original default judgment . . . and to dismiss this case without prejudice on its own motion."[10]  *Dawn Shipping v. C& Merch. Marine Co.*, 08 Civ.7827 (JGK), 2009 WL 4729878 at *1 (S.D.N.Y. 2009).  Given the lack of personal jurisdiction over Ayvazian, any judgment rendered in this case would be void.  Moreover, as noted above, the complaint does not plausibly allege any basis for vacatur of the arbitral award under the narrow criteria set forth in the Federal Arbitration Act.  Under these conditions, further litigation would be wasteful and improper.  Accordingly, the case is dismissed without prejudice.

---

[10] Although courts have questioned the propriety of *sua sponte* dismissal based on lack of personal jurisdiction where the defendant does not appear, *see Sifandros Carrier v. LMJ Int'l Ltd.*, 08 Civ. 5999 (RIH), 2010 WL 165989 (S.D.N.Y. 2010) (finding a suggestion of impropriety in a footnote in *Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 209 n.16 (2d Cir. 2003)), other courts have not found such arguments persuasive, *see Melco Mar. LLC v. Inter Alyans Ltd.*, 08 Civ. 8085 (LAP), 2010 WL 582216 (S.D.N.Y. 2010) (rejecting the "argument that it would be inappropriate for the court to dismiss the action *sua sponte* for lack of personal jurisdiction").  Ultimately, such arguments are inapplicable here since both parties have fully presented their arguments on personal jurisdiction.

III.     **Conclusion**

Because this Court lacks personal jurisdiction over Ayvazian, the default judgment is void and must be set aside.  Equitable factors also support this outcome.  Global Gold has had its day in court and has also had its day before the Tribunal that it contracted for, from behind a veil of ignorance, before the dispute arose.[11]  Faced with consistent adverse decisions, it now seeks to change the rules of the game.  This is the rare case where the interests of finality and the interests of protecting a defaulting defendant are aligned: Global Gold may not circumvent the decision of the ICA Tribunal by returning to this Court, which lacks jurisdiction over Ayvazian.

For the foregoing reasons, Defendant Ayvazian's motion to vacate default judgment (Dkt. No. 15) is GRANTED, and the default judgment entered in this case on July 11, 2012 (Dkt. No. 9) is hereby VACATED.

The complaint is hereby dismissed without prejudice.

The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated:  New York, New York
             November 21, 2013

_____
                       J. PAUL OETKEN
                 United States District Judge

---

[11] In *A Theory of Justice*, the philosopher John Rawls posits that "pure procedural justice" could be achieved if parties designed the rules of engagement from "behind a veil of ignorance"—that is, if the parties designed the rules for dispute resolution before "specific contingencies" arose which might tempt a party to select rules with a view toward a desired outcome, rather than a view toward achieving procedural justice.  118 (Harvard University Press, 1999).  In this case, Global Gold and the SHA shareholders jointly designed a system for dispute resolution from behind a veil of ignorance; that system is articulated in the Agreement and it favors arbitration.